(92 South. 375)

No. 25130.

SHAW v. WATSON, Tax Assessor.

(May 8, 1922. Rehearing Denied by Whole Court June 10, 1922.)

*(Syllabus by Editorial Staff.)*

1. **Mines and minerals ⬧⟹55(2)—Sale of oil and gas rights is alienation of integral part of ownership of land.**

A sale of a landowner's right to the oil or gas beneath his land is an alienation of a real right or servitude.

2. **Mines and minerals ⬧⟹48—Right to oil or gas is incorporeal immovable property.**

A right to the oil or gas beneath land conveyed by the landowner to another is incorporeal property in the category of immovable property or real estate.

3. **Taxation ⬧⟹233—Statute held not to exempt royalty interests or mineral rights owned by nonproducers.**

Act No. 31 of 1920, § 4, providing that no tax in addition to the license tax thereby levied shall be imposed upon the rights to produce oil and gas, etc., does not exempt from taxation royalty interests or mineral rights owned by nonproducers.

4. **Taxation ⬧⟹348—Value of royalty interests or mineral rights owned by landowner added to value of land, but not value of interests owned by others.**

Under Const. art. 10, § 21, and Act No. 170 of 1898, §§ 1, 91, royalties or mineral rights belonging to the landowner need not be assessed separately, and their value may be added to the other value of the land, but the value of royalty interests or mineral rights alienated and not owned by the landowner cannot be assessed against him or added to the assessment of the land.

5. **Constitutional law ⬧⟹229(1)—Taxation ⬧⟹37—To assess mineral rights against landowners not owning such rights would deny equal protection of the laws.**

To assess against a landowner the value of mineral rights or royalty interests not owned by him would constitute an arbitrary discrimination against landowners having no interest in the minerals, and deprive them of the equal protection of the laws.

6. **Taxation ⬧⟹499—Assessment when not excessive not reduced merely because excessive on erroneous theory of valuation adopted by assessor.**

Where the assessment of a landowner's royalty interest in oil-producing lands, as reduced by the court, was not excessive, it will not be further reduced merely because the value of the daily production of oil per barrel erroneously adopted by the assessor, if followed, would require a further reduction.

7. **Taxation ⬧⟹499—When assessment reduced more than 25 per cent., taxpayer not liable for attorney's fee, though suit was in the alternative for cancellation.**

Under Act No. 140 of 1916, § 16, and Act No. 170 of 1898, § 56, where, in an action in the alternative for cancellation of an assessment or for its reduction, the assessment was reduced more than 25 per cent. of the whole assessment, plaintiff was not liable for the tax collector's attorney's fee, though he did not succeed so far as the suit sought cancellation.

Provosty, C. J., and St. Paul, J., dissenting to denial of rehearing.

Appeal from Third Judicial District Court, Parish of Claiborne; J. E. Reynolds, Judge.

Action by G. T. Shaw against J. R. Watson, Tax Assessor, and others. From a judg-

ment in favor of plaintiff, defendants appeal. Affirmed.

A. V. Coco, Atty. Gen., and E. C. McClendon, of Homer (Harry P. Sneed, of New Orleans, of counsel), for appellants.

Blanchard, Goldstein & Walker, of Shreveport, and T. M. Milling, of New Orleans, for appellee.

Thigpen, Herold & Lee, of Shreveport, for third parties interested.

By Division B, composed of Justices O'NIELL, DAWKINS, and BAKER. (Note.—In this case Mr. Justice LAND having recused himself, Mr. Justice DAWKINS, of Division C, took part in the case.)

O'NIELL, J. This was originally an action to cancel an assessment of $5,998,830 on oil-producing lands, or, in the alternative, to reduce the assessment to $129,989. The assessment was for the taxes of 1921. The suit was founded upon the fact that the assessment or valuation of plaintiff's land included the value of mineral rights belonging to other parties. Hence the primary demand for cancellation of the assessment was founded upon the contention that the valuation of the mineral rights of other persons with plaintiff's interest in the land was so confused that the respective interests could not be separated or apportioned in the assessment complained of. The district court gave judgment for plaintiff, reducing the assessment to $600,000; and the defendants, tax assessor, tax collector, police jury, and Louisiana tax commission, have appealed. Answering the appeal, plaintiff prays that the judgment be amended by reducing the assessment to $309,190.

The main question propounded is whether the valuation of a tract of oil-producing land for taxes assessed against its owner should include the value of mineral rights or royalties which the landowner had sold before the beginning of the calendar year for which the taxes were assessed.

The assessment complained of is of 1,975 acres of land owned by plaintiff in the parish of Claiborne. Before the discovery of oil in that parish, the land had not much value. In 1918, when the parish was yet wildcat territory, several oil and development companies acquired ordinary oil and gas leases, reserving to the lessors or grantors the usual one-eighth royalty interest on the lands of plaintiff and of his neighbors. In January, 1919, the discovery well, producing oil in large quantities, was brought in on plaintiff's land. Thereafter, in the same year, plaintiff sold to the Higgins Oil & Fuel Company a half interest in his mineral rights, subject to the leases, which left him owning a sixteenth royalty interest. Later in the same year he sold to S. L. Herold, who sold to the Muslow Oil Company, a fourth of his (plaintiff's) mineral rights in about 700 acres of the land, subject to the leases, which left plaintiff owning a thirty-second royalty interest in that part of the land. The leases and deeds for the mineral rights and royalties were duly recorded.

Therefore, at the beginning of the year 1921, plaintiff owned the 1,975 acres of land, subject to the leases which he had granted before the discovery of oil; but his interest in the mineral oil had been reduced to the right to receive a sixteenth of the oil produced from an area of 1,275 acres, and the right to receive a thirty-second of the oil produced from the remaining area of 700 acres.

Following instructions from the Louisiana tax commission, the assessor, in assessing the land for the taxes of 1921, included the entire oil-producing value as belonging to the landowner; that is, he included the value to the lessees who were producing the oil, and the value of the royalty interests which plaintiff had sold, as well as the value of his remaining royalty interest.

The rule or formula suggested by the tax

commission, and employed by the assessor, for computing the oil-producing value of the land, was to multiply the number of barrels of settled production on the 1st day of January by the current selling price or market value per barrel—of such production. The rule was explained in a circular of instructions sent out by the board of state affairs (now the Louisiana tax commission) to the assessors throughout the state, viz.:

"Assessors are instructed to obtain the settled production of oil-producing wells as of January 1, 1921, and multiply same by the current selling price or market value of production per barrel on like date, and fix that result as the amount of assessment to be added to the ordinary value of the land. To illustrate: If the settled production of an oil well, on January 1st is 300 barrels per day, and the selling price of such production, based on its gravity and the probable life of the particular field where the production is situated, is $500 per barrel, then the value of the well is 500 times the settled production, or $150,000, which is to be added to the ordinary value of the land, to be listed against the landowner of record as of January 1st.

"It has been contended by landowners owning this class of property that, if the owner's royalty in the production has been sold in part, the proportionate added value of the mineral production should be listed against the royalty owners. The board of state affairs, while admitting the equity of this claim, is of the opinion, under a ruling of the Attorney General of the state of Louisiana in the year 1915, and the decision of the Supreme Court of Louisiana in Palmer Company et al. v. Police Jury of Red River Parish et al., reported in 142 La. 1076 [78 South. 122], that the entire value of the mineral production must be listed against the landowner."

This rule for estimating the oil-producing value of a tract of land, or the value of its so-called production, appears to be as fair and accurate a method as could be devised. It leaves nothing to be estimated except the market value or selling price of production in the oil field in which the land is situated. There is no complaint about that. But the idea that the landowner, having only a comparatively small royalty interest in the pro-

duction, should be assessed and taxed for its entire value, including interests owned by other persons whose titles are of record, is wrong. In fact, it was admitted to be wrong in the letter of instructions issued by the board of state affairs, the predecessor of the Louisiana tax commission. The board felt constrained to require the landowner to pay taxes on mineral rights which he did not own, because of the board's interpretation of the decision of this court in the case of Palmer Co. v. Police Jury, 142 La. 1076, 78 South. 122. But the board was mistaken in its interpretation of the decision. The case did not present the question whether a landowner should pay taxes on mineral rights which he had sold. The only question was whether the assessor should have added to the agricultural value of the plaintiffs' lands their mineral value, for the royalties which the landowners were receiving. The plaintiffs, landowners, contended that the adding of the mineral value to the agricultural value of their lands constituted a separate assessment of their share of the oil before it was produced. The landowners were not assessed for any mineral value or royalty interest that they did not own. The doctrine of the decision is stated correctly in the syllabus, viz.:

"Adding to the agricultural value the mineral value of land assessed, based upon the quantity of oil produced, is not a separate assessment of the mineral oil."

The royalty interest of a landowner in oil-producing land is a part of his interest in the land. There is no reason why the royalty interest of the landowner should be assessed separately from his interest in the land for any other value that it has. But a sale of a landowner's royalty interest in oil-producing land, or a sale of his mineral rights, either in whole or in part, is a conveyance of a part of his ownership of the land. And it makes no difference, in

that respect, whether a conveyance of the mineral rights be styled a sale or a lease.

The main argument of the appellants in this case is that an assessment of land for taxes is a proceeding in rem, and that every element of its value should be included in the assessment. There is no dispute about that. But it does not follow that elements of value not owned by the owner of the surface should be assessed to him, or added to the assessment of the surface to him.

[1, 2] It is argued that a transfer of a landowner's mineral rights, either in whole or in part, whether in the form of a sale or a lease, is nothing more than the imposing of an incumbrance upon his land, like a mortgage, or an ordinary lease for occupancy or cultivation. Our opinion is that a landowner's sale of his mineral rights cannot be compared, in that respect, with his mortgaging his land, or subjecting it to an ordinary lease for occupancy or cultivation. It is settled in this state that a sale of a landowner's right to the oil or gas beneath his land is an alienation of a real right, which, with regard to the prescription by which such rights are released, is classed as a servitude upon the land. Frost-Johnson Lumber Co. v. Heirs of Salling (No. 22916; La.) 150 La. 756, 91 South. 207. Such a right, of course, is incorporeal property, in the category of immovable property or real estate. Strother v. Mangham, 138 La. 437, 70 South. 426; Hanby v. Texas Co., 140 La. 189, 72 South. 933. A sale of a landowner's mineral rights, either in whole or in part, is therefore an alienation of a part of his interest in the land. It is a dismemberment of his ownership, as held in Frost-Johnson Lumber Co. v. Salling's Heirs. In that respect it is more like a sale of an undivided interest in the land than like the imposing of a mortgage or an ordinary lease upon the land. A mortgage or an ordinary lease is not a transfer of any element of ownership in the property mortgaged or leased. For that reason mortgages and ordinary leases are not subjected to taxation by the Revenue Law (Act 170 of 1898). The distinction between them and a conveyance of mineral rights in the form of a lease is recognized by the courts of other states. Wolfe County v. Beckett, 127 Ky. 252, 105 S. W. 447, 17 L. R. A. (N. S.) 668; Graciosa Oil Co. v. Santa Barbara County, 155 Cal. 140, 99 Pac. 483, 20 L. R. A. (N. S.) 211; Texas Co. v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989; People v. Bell, 237 Ill. 332, 86 N. E. 593, 19 L. R. A. (N. S.) 746, 15 Ann. Cas. 511.

[3] The interests of lessees of oil-producing lands engaged in producing the oil are subjected to the license tax, conservation tax, or severance tax imposed by Act 31 of 1920 upon all persons, firms or corporations, engaged in severing natural resources from the soil. Section 4 of the statute declares:

"And the payment of the license tax levied by this act shall be in addition to, and shall not affect the liability of the parties so taxed for, the payment of all state, parochial, municipal, district and special taxes upon their real estate and other corporeal property; but no other tax in addition hereto shall be imposed upon the rights to produce in this state those things whose production is subjected to a license tax by the provisions of this act."

[4] Whether this severance tax referred to is a lieu tax as far as the producer is concerned, exempting the oil or the lease itself from further taxation, is a question which we are not now concerned with. The language of the last clause quoted is peculiar, in that it purports to exempt from further taxation only "the rights to produce." But the statute does not exempt from taxation royalty interests or mineral rights held by nonproducers. Section 21 of article 10 of the Constitution of 1921, providing for severance taxes, declares that no further or additional tax or license shall be levied or imposed upon oil or gas leases

or rights, and that no additional value shall be added to the assessment of lands by reason of the presence of oil or gas therein, or their production therefrom. But there is a proviso in that section that all existing laws relating to severance taxes and licenses, and to the assessment and taxation of lands producing oil or gas, shall remain in force and effect until the Legislature shall have enacted laws putting the provisions of that section of the Constitution into effect.

We do not maintain that royalty interests or mineral rights owned by nonproducers are not subject to taxation, under section 1 of Act 170 of 1898, subjecting to taxation "all movable and immovable corporeal and incorporeal articles or things of value, owned and held and controlled within the state of Louisiana by any person in any capacity whatsoever."

What we maintain is that, if such incorporeal property be assessed for taxes, it should be assessed in the name of its owner, according to the conveyance records of the parish in which is situated the land to which the real right is attached. To the extent to which the royalties or mineral rights belong to the landowner, they need not be assessed separately from the land. Their value may be added to the other value of the land. But, to the extent to which the landowner has alienated his royalty interest or mineral rights by recorded deeds of conveyance, such rights should not be assessed against him, nor should their value be added to the assessment of his land for taxes.

The first paragraph of section 91 of Act 170 of 1898 declares:

"The term 'real estate' shall be held to mean and include, not only land, city, town and village lots, but all things thereunto pertaining, and all structures and other things so annexed and attached thereto, as to pass to the vendee by the conveyance of the land or lot."

[5] That means merely that the value of all improvements on land, and of all appurtenances thereto, such as would go without saying, or pass to the vendee without any stipulation regarding them, in an alienation of the land, should be included in the assessment of the land for taxes. But the expression in the statute, "as to pass to the vendee by the conveyance of the land or lot," is not to be disregarded; for one of the cardinal rules of assessment of property for taxes is that it should be assessed in the name of its owner. Howcott v. Board of Commissioners, 46 La. Ann. 322, 14 South. 848. When two or more persons own a tract of land jointly, and in equal proportions, it may be assessed for taxes as a whole, in the names of both or all of its owners. But, when two or more persons own a tract of land jointly, but in unequal proportions, the correct way to assess it for taxes is to assess each fractional part or proportion to its owner. Russell v. Lang, 50 La. Ann. 44, 23 South. 113; Howcott v. City of New Orleans, 107 La. 305, 31 South. 668. The rule is also applicable to a joint ownership of mineral rights in a tract of land, or to a case where one person owns the land and another the mineral rights. Low v. Lincoln County, 27 W. Va. 785; Harvey Coal Co. v. Dillon, 59 W. Va. 605, 53 S. E. 928, 6 L. R. A. (N. S.) 645. The fundamental rule to be observed is that a person should not be assessed for taxes on property that does not belong to him. In violation of that rule, the assessment attempted in this case was ten times the value of the tax debtor's holdings. Such a method of assessment would lead to confiscation; for there is no more reason for saying that a landowner who owns only a fractional part of the mineral rights in his land should pay taxes on all of the mineral rights than there would be for saying that a landowner who owns no part of the mineral rights should pay taxes on them. The method of assessment complained of is therefore an arbitrary discrimination against the class of landowners

who have no interest in the minerals underlying their lands, and it would therefore deprive that class of property owners of the equal protection of the law. Stanley, Executrix, v. Board of Supervisors, 121 U. S. 535, 7 Sup. Ct. 1234, 30 L. Ed. 1000; Raymond v. Chicago Union Traction Co., 207 U. S. 35, 28 Sup. Ct. 7, 52 L. Ed. 87, 12 Ann. Cas. 757; Greene v. Louisville & Interurban Railroad Co., 244 U. S. 499, 37 Sup. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88.

Our conclusion is that the assessor should not have included in the assessment of plaintiff's land the value of the mineral rights which he had disposed of by deeds of conveyance which were duly recorded.

[6] Appellee's prayer for a further reduction of the assessment, in his answer to this appeal, is founded upon the fact that 45 per cent. of the production of oil from his land on the 1st of January, 1921, came from that part of the land in which he owned only a thirty-second royalty interest, and the remaining 55 per cent. of the production came from the land in which he owned a sixteenth royalty interest. The production on that date was 11,958.4 barrels. A thirty-second of 45 per cent. (5,381.28) of that sum gave plaintiff 168.16½ barrels, and a sixteenth of 55 per cent. (6,577.12) gave him 411.07 barrels, making a total of 579.22½ barrels of oil received by plaintiff, which, at $500 per barrel of production, would make his royalty interest worth $289,612.50, to which should be added $19,570, being the value at which the land and improvements were assessed, otherwise than for the mineral value, which would make a total assessment of $309,182.50. That would be the correct assessment if the valuation of the production at $500 per barrel was correct. But the evidence shows that the production was worth twice that price. An estimate of $1,000 ($1,002.20, to be exact) per barrel daily production would make the assessment of plaintiff's royalty interest correct. The testimony in the case shows conclusively, and it is virtually admitted in the briefs filed on behalf of appellee, that the assessment reduced to $600,000 is not excessive. We maintain, therefore, that the assessment should not be controlled by the error of the assessor in adopting as the value of the daily production of oil per barrel the figure which was suggested by the tax commission merely for the purpose of illustration.

[7] The only remaining question is whether plaintiff should be condemned to pay, as a statutory penalty for his unsuccessful attempt to cancel the assessment entirely, the tax collector's attorney's fee of 10 per cent. on the amount of the taxes to be paid. Section 16 of Act 140 of 1916, p. 339, declares that the attorney for the tax collector shall receive a commission of 10 per cent. on the amount of taxes involved and collected if the assessment be sustained or be not reduced more than 25 per cent. of the reduction claimed, which shall be assessed as a penalty against the tax payer, and that the attorney shall receive 5 per cent. of the taxes involved and collected if the assessment be not sustained, in which latter event the commission is to be paid by the tax collector when the taxes and penalties are collected. The provision for the commission or fee of 5 per cent. has been construed to mean that the attorney shall receive from the tax collector, but not as a penalty from the taxpayer, 5 per cent. of the amount of taxes collected if the taxpayer succeeds in reducing the assessment more than 25 per cent. of the reduction sued for. Baton Rouge Waterworks Co. v. Board of State Affairs, 149 La. 383, 89 South. 247. It is argued on behalf of the attorney for the tax collector that section 16 of Act 140 of 1916 refers only to suits for reduction of assessments, not to a suit for cancellation of an assessment, and that this suit was, primarily, a suit for cancellation of the assessment. The suit was, originally, for cancellation of

the assessment, and, in the alternative, for a reduction. Plaintiff has succeeded in reducing the assessment more than 25 per cent. of the reduction claimed. In fact, he has obtained a reduction of 90 per cent. of the total assessment. It is therefore conceded that he would not owe the tax collector's attorney's fee if he had sued only for a reduction of the assessment. It is contended, though, on behalf of .the attorney for the tax collector, that the suit should be regarded as two separate and distinct suits, one for cancellation and the other for a reduction of the assessment, and that, although plaintiff has succeeded in his suit for reduction, he has failed in his suit for cancellation. It is argued that the second paragraph of section 56 of Act 170 of 1898, in so far as it refers to .suits for cancellation of assessments, has not been repealed or affected by section 16 of Act 140 of 1916, referring to suits for reduction of assessments. The act of 1898 fixed the tax collector's attorney's fee at 10 per cent. on the amount of taxes collected, in a suit for the collection or for a reduction of the taxes, or in an injunction proceeding to restrain the collection of a tax, which fee was to be paid by the taxpayer. That provision of the law would be applicable yet to an unsuccessful suit for annulment or cancellation of an assessment, without an alternative demand for a reduction of the assessment. In fact it would be just as applicable as is section 16 . of Act 140 of 1916 to a suit for cancellation and, in the alternative, for a reduction of an assessment, provided the plaintiff did not obtain a reduction exceeding 25 per cent. of the reduction claimed, which, in such case, might be held to be the total amount of the assessment. The penalty in this case would be the same under either statute if plaintiff had failed to obtain a reduction exceeding 25 per cent. of the reduction claimed. But there is no reason why a person who desires to sue for a cancellation of a tax assessment, or, in the alternative, for a reduction of the assessment, should be compelled to bring two suits merely to subject him to the risk of having to pay the penalty if he should fail in his primary demand. The case of the Baton Rouge Waterworks Co. v. Board of State Affairs, 149 La. 383, 89 South.' 247, was, as stated in the outset of the opinion, a suit "to annul or in the alternative to reduce an assessment." The assessment of $180,200 in that case was reduced to $135,150—that is, more than 25 per cent. of the reduction claimed—and it was therefore conceded that the taxpayer did not owe the tax collector's attorney's fee. In the course of the opinion it was said:

"The reduction claimed in this case was the entire assessment of $185,200."

If that should be said of this case, the reduction obtained would yet exceed 25 per cent. of the reduction claimed. Inasmuch as the further a tax debtor claims a reduction of his assessment the greater is his risk of having to pay the tax collector's attorney's fee, it can hardly be said that a demand for a complete cancellation of the assessment, when tacked onto a demand for a reduction, takes a free ride, pour ainsi dire.

The judgment appealed from is affirmed.

LAND, J., recused.

On Application for Rehearing.

By the WHOLE COURT.

PER CURIAM. The defendants, appellants, have asked for a rehearing on the main issue in this case and on the question of liability of the taxpayer for the tax collector's attorney's fee.

On the question of liability for the tax collector's attorney's fee, it is argued again, and with unusual ability, that section 16 of Act 140 of 1916, which deals only with suits

for reduction of assessments, did not repeal the provisions in the second paragraph of section 56 of Act 170 of 1898, referring to suits for cancellation of assessments.

If the lawmaker, in writing the second paragraph of section 56 of Act 170 of 1898, did not intend that a suit for cancellation of an assessment should be dealt with as if it were a suit for a reduction of the assessment, the lawmaker did not make any provision for a suit for cancellation of an assessment with regard to the tax debtor's liability for the tax collector's attorney's fee. The paragraph referred to declares that a tax debtor shall pay, as a penalty, the tax collector's attorney's fee of 10 per cent. if the tax debtor be unsuccessful (1) in a proceeding for a reduction of an assessment, (2) in a proceeding for the collection of taxes, or (3) in an injunction suit to prevent the tax collector from collecting taxes. The statute does not, in terms, mention a suit for cancellation of an assessment. A suit for cancellation of an assessment is not a proceeding for the collection of taxes. Therefore, if such a suit be not accompanied by a preliminary injunction, it would not carry a liability for the penalty of having to pay the tax collector's attorney's fee, unless such a suit should be treated as if it were a suit for a reduction of the assessment. In so far as it has been so treated, with regard to the liability for the tax collector's attorney's fee, before the statute of 1916 was enacted, it must now be governed by the statute of 1916, which deals only with suits for reduction of assessments. When we say that a suit for cancellation of an assessment has been dealt with heretofore as if it were a suit for a reduction of the assessment, we mean, of course, that it has been so treated only with regard to the tax debtor's liability for the tax collector's at-

torney's fee. The cause of action, and the issues that arise, in a suit for a reduction of an alleged excessive assessment, are usually very simple, and are quite different from the cause of action and the issues that may arise in a suit to cancel an alleged illegal assessment. A demand for cancellation of an alleged illegal assessment does not essentially include a demand for reduction of an excessive assessment. Liverpool & London & Globe Insurance Co. v. Board of Assessors, 122 La. 98, 47 South. 415; Standard Marine Insurance Co. v. Board of Assessors, 123 La. 717, 49 South. 483, 29 L. R. A. (N. S.) 59. But an alternative demand for a reduction of an assessment may be urged in a suit for cancellation of the assessment. New England Mutual Life Insurance Co. v. Board of Assessors, 121 La. 1068, 47 South. 27, 26 L. R. A. (N. S.) 1120. In such case, if the tax debtor's liability for the tax collector's attorney's fee be not governed by the law relating to suits for reduction of assessments, there is no law imposing upon the tax debtor the penalty or liability for the tax collector's attorney's fee in the suit for cancellation of the assessment.

On the main issue in this case, it is true, we did not, in our original opinion, refer to the decision in Marston v. Elliott, Tax Collector, et al., 138 La. 574, 70 South. 519. We did not, and do not yet, consider the decision appropriate, because it does not affect the question presented in this case; that is, whether the value of mineral rights that have been disposed of by the landowner should be included in the valuation or assessment of his land for taxes.

The application for a rehearing is denied.

PROVOSTY, C. J., and ST. PAUL, J., dissent from the refusal to grant a rehearing.