No. 619

First Circuit

IBERVILLE LAND CO. v. THE TEXAS CO.
IBERVILLE LAND CO. v. SHERBURNE
(THE TEXAS CO., Garnishee)

(May 6, 1930. Opinion and Decree.)
(June 9, 1930. Rehearing Refused.)
(October 7, 1930. Writs of Certiorari and Review Refused by Supreme Court.)

Brian & Brian, of New Orleans, attorneys for plaintiff, appellant.

Borah, Himel & Bloch, of New Orleans, attorneys for defendant, appellee.

LeBLANC, J. On August 22, 1919, the plaintiff executed a deed, which is referred to in the petition in this case as a sale of:

"All of the oil, gas, sulphur, salt and all other minerals or things of any character whatsoever in, under and beneath 21,653.97 acres of land, located in the Parishes of Iberville and St. Martin, State of Louisiana, and also all of the subsoil on subjacent land lying or extending from and below a plane running parallel with the surface of said land and at a depth of 500 feet, measuring from said surface. * * * "

The following clause regarding the payment of taxes is incorporated in the so-called act of sale:

"The taxes on the herebefore described land are paid up to January 1, 1919, and it is understood and agreed that so long as the value of the estate rights and interest of the Texas Company are included for the purpose of taxation, assessment and public charges, with the estate interest and rights of the Iberville Land Company, said The Texas Company shall pay when due and before delinquent, one fourth (¼) of such taxes and assessments. * * * "

On May 18, 1923, the Iberville Land Company sold the surface land above the 500 feet plane to Henry N. Sherburne on terms of credit, and subrogated him to its right to collect one-fourth of the taxes from the Texas Company under the stipulation in its deed to that company of August 22, 1919. Sherburne defaulted in his payments, and the Iberville Land Company obtained judgment against him. He had paid all the taxes on the property for the years 1924 and 1925. Claiming that the Texas Company owed him one-fourth of the amount he had paid, the Iberville Land Company instituted garnishment proceedings against that company under a writ of fi. fa. issued against Sherburne.

As the decision in the garnishment case depended on the result of the trial of the direct action against the Texas Company, and both involved the interpretation of the tax clause already quoted, the cases were consolidated for trial and appeal.

The judgment in the lower court was in favor of the defendant, and the plaintiff has appealed.

It seems apparent that in the purported sale to the Texas Company there was an attempt made to create two separate estates out of the same property by dividing the property conveyed into two horizontal planes, and the Texas Company apparently bought all the subsoil below an imaginary plane 500 feet below the surface, and the Iberville Company retained everything above that depth. The parties to the deed were doubtless strangely controlled in their efforts to divide the property in such manner by certain language used by the Supreme Court in the case of De Moss v. Sample, 143 La. 243, 78 So. 482, which would indicate that such a division were possible. But whatever that language may or may not have meant is of no moment now, as in a later decision, Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, at page 856, 91 So. 207, 242, we read:

"When the original opinion was handed down by Mr. Justice O'Niell on January 5, 1920, this court then held for the *ninth*

time that oil and gas in place are not subject to absolute ownership as specific things apart from the soil of which they form part, and that a grant or reservation of such oil and gas carried only the right to extract such minerals from the soil. * * * It is said that this court has held otherwise in De Moss v. Sample, 143 La. 243, 78 So. 482, and Calhoun v. Ardis, 144 La. 311, 80 So. 548. But we do not find it so; for an opinion is authority only in so far as the ratio dicendi is necessary for a decision of the precise issue involved in the case."

Later, in another case, Wemple v. Nabors Oil Co., 154 La. page 483, 97 So. 666, 667, the court said:

"The matter, therefore, resolves itself into this, whether in Louisiana there can be a corporeal mineral estate in lands.

"It is quite certain that nowhere does our statutory law provide for such an estate; and it is equally certain that never in our jurisprudence has any such estate been recognized, unless in the purely obiter expressions to be found in De Moss v. Sample, 143 La. 243, 78 So. 482, and Calhoun v. Ardis, 144 La. 311, 80 So. 548 (as to which see Frost-Johnson Lumber Co. v. Salling's Heirs. On rehearing, 150 La. 756, 91 So. 207).

"On the contrary, our civil law, coming to us through Roman, Spanish, and French sources, recognizes put two kinds of estates in lands, the one corporeal and termed ownership, being the dominion over the soil and all that lies directly above and below it (C. C. art. 505); and the other incorporeal and termed servitude (including usufruct) being a charge imposed upon land for the utility of other lands or persons (C. C. arts. 533, 646, 647).

"And accordingly this court has always resisted every attempt to introduce into this state any system of land tenures and estates in lands inconsistent with these simple but fundamental principles."

This is sufficient authority, we think, for us to hold that in their effort, no doubt well intended, to create by their agreement two different land tenures or estates out of the same property, the parties were attempting to do a thing that was a legal impossibility. The purported sale of the subsoil therefore was nothing more than the ordinary oil or mineral lease with all the rights of servitude which generally accompany it.

Under the method of assessment prevailing in 1919, when the contract between the parties in this litigation was entered into, the mineral value of land was added to its agricultural value and the whole was assessed as land. See Palmer Co. v. Police Jury, 142 La. 1080, 78 So. 122. Obviously, in considering and inserting the clause relating to the payment of taxes in their agreement, the parties had that kind of assessment in mind and adopted it as the basis on which each would pay his just proportion of the taxes.

As long as that method of assessment of mineral rights, recognized as it has been by the Supreme Court, prevailed, or, in other words, as long as the value of the estate rights and interests of the Texas Company (which were the mineral rights) were assessed in globo with the value of the estate rights of the Iberville Land Company (the land itself), the Texas Company was bounded by the tax clause and had to pay its one-fourth of the taxes. This it did until 1924, although the payment of its proportion in 1922 and 1923 was under misapprehension and in ignorance of the fact that the Constitution of 1921 had changed the form of assessing minerals and mineral rights and leases. Under the new method, taxes were to be levied "on natural resources severed from the soil or water" and "no further or additional tax or license shall be levied or imposed upon oil or gas leases or rights, nor shall any additional value be added to the assessment of land, by reason * * * of oil or gas therein or their production

therefrom." Section 21, article 10, Constitution of 1921.

In carrying out this provision of the Constitution the Legislature enacted Act No. 140 of 1922, which imposes a severance tax of 3 per cent on the gross market value of the total production of oil and gas severed from the soil or water. The imposition of such tax was clearly intended as a substitute for the taxes that were formerly collected additionally on lands that were producing oil or gas, or in which oil or gas rights had been leased.

In the case of Bodcaw Lumber Co. of Louisiana, Incorporated, v. Cox et al., 159 La. 810, 106 So. 313, 314, the plaintiff was endeavoring to maintain his title to the oil, gas, and mineral rights which he had reserved in the sale of his property to another party. The property was subsequently sold for taxes, and, disregarding the reservation of the mineral rights, the adjudicatee at tax sale executed a gas and oil lease on the land to another party. The Supreme Court recognized the plaintiff's ownership under his reservation of the mineral rights, unaffected by the tax sale, saying, relative to the assessment, that:

"There was no assessment of the mineral rights either with or separate from the land, and there could not have been, in view of section 21, article 10, Constitution of 1921, and in view of the ruling in Shaw v. Watson, 151 La. 903, 92 So. 375."

Under the clear prohibition in the Constitution against adding to the assessment of the land, any additional value because of the presence of oil or gas therein or their production therefrom, and under the ruling of the Supreme Court in the last case cited that there can be no assessment of mineral rights either with or separate from the land, it is manifest that the "value of the estate, rights and interests of the Texas Company" can no longer be "included for the purpose of taxation, assessment and public charges with the estate interests and rights of the Iberville Land Company," and consequently the Texas Company has no further liability in the matter of the payment of taxes under the stipulation contained in its contract with the Iberville Land Company.

The judgment in each case is affirmed.