MORLOCK *v.* MOUNT FOREST FUR FARMS OF AMERICA, INC.

1. CONTRACTS—CONSTRUCTION—MUSKRATS.

Construction of contract for purchase of two pairs of muskrats and which also provides for their ranching and disposition of increase, to include agreement to guarantee a stated annual increase and pyramid same over a three-year period *held*, justified where purchaser left rats with seller and gave it half the increase.

2. SAME—MUSKRATS—ASSUMPSIT—DAMAGES—EVIDENCE.

In action of assumpsit against one who sold two pairs of muskrats for $70 by purchaser under contract also providing for ranching, guaranteeing, pyramiding and disposition of increase

for three-year period, evidence including that of seller's advisory biologist *held*, to justify fixing amount of damages for nonperformance of contract at $4,093.20 with interest.

3. Same—Unconscionable Contracts—Nature.
   Contracts so inequitable and unconscionable that courts will not enforce them must be such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.

4. Corporations—Sale of Assets—Assumption of Obligations.
   A corporation purchasing all the assets of another corporation assumes its debts and liabilities, when by agreement, express or implied, it promises to pay the debts of the selling corporation.

5. Same—Sale of Property—Rights of Creditors.
   A corporation cannot sell all of its property, and take in payment stock in a new corporation, under an arrangement that has the effect of distributing the assets of the vendor among its stockholders, to the exclusion and prejudice of its creditors.

6. Same—Liability for Breach of Contract.
   Finding of trial court that foreign corporation which took over all the assets of Michigan corporation and assumed its liabilities became liable thereafter to creditor of latter for damages for breach of contract *held*, without error.

7. Contracts—Business—Construction.
   Courts can construe but cannot make contracts for parties engaged in business affairs even though recovery permitted thereunder is out of all proportion to investment.

Appeal from Calhoun; Hatch (Blaine W.), J. Submitted October 11, 1934. (Docket No. 69, Calendar No. 37,717.) Decided December 10, 1934. Rehearing denied January 29, 1935.

Assumpsit by H. P. Morlock against Mount Forest Fur Farm, a Michigan corporation, and Mount Forest Fur Farms of America, Inc., a Delaware corporation, for breach of contract relative to muskrats. Discontinuance was had as to the Michigan corporation and Harry J. Merritt, receiver, was substituted for the Delaware corporation. From judg-

ment for plaintiff against the Delaware corporation and its receiver, they appeal. Affirmed.

*William J. Kearney (Rosenburg & Painter,* of counsel), for plaintiff.

*Arthur F. Neef,* for defendants.

Nelson Sharpe, C. J. On July 7, 1926, a contract was entered into between "H. P. Morlock and wife" and F. M. Langworthy, sales representative of the Mt. Forest Fur Farm, a Michigan corporation, which contained the following provisions:

Morlock and wife purchased from the Fur Farm two pairs of muskrats, Mt. Forest strain, paying therefor the sum of $70.

"Mt. Forest Fur Farm guarantees the purchaser an increase of at least 30 embryos per pair, per year, for at least three years, purchaser's share being one-half, providing the muskrats are being ranched at farms or ranches owned or controlled by the Mt. Forest Fur Farm."

It contained the following question and answer:

"The undersigned requests that the Mt. Forest Fur Farm ranch these muskrats .......... Yes."

The provision for ranching read as follows:

"The present charge for ranching is one-half of all litters dropped while purchaser's muskrats are being ranched by the Mt. Forest Fur Farm, and the purchaser agrees to so pay for ranching his muskrats in this manner and amount."

It was approved and accepted by M. S. Bangs, general manager, Mt. Forest Fur Farm, on July 12, 1926.

A special agreement was attached to the contract, signed by H. P. Morlock and wife and Langworthy,

and approved and accepted by Bangs on the 12th day of July, 1926. A memorandum at the top thereof read as follows:

"IMPORTANT NOTICE TO SALESMEN:

"This special agreement is to be used only when you are sure that the purchaser will agree to, and actually will assist you in securing other Mt. Forest customers in your territory; and whose success will serve as an incentive to others to become owners of Mt. Forest supreme quality muskrats.

"(When used this special agreement should be securely attached to the regular contract form of which this becomes a part.)"

It contained the following:

"Mt. Forest Fur Farm agrees to buy from the customer who has contracted for muskrats on the attached order form, of which this forms a part, the pelts from all muskrats the customer may have, as his share, one year from the date of this contract attached, these muskrats being from the muskrats contracted for and ranched by the Mt. Forest Fur Farm according to this contract attached, payment to be made not sooner than 13 months, and not later than 14 months from the date of this contract attached. * * *

"It is understood and agreed that the purchaser under this special agreement may at his option waiver the foregoing agreement, but that such waiver must be exercised at least within 10 months from the date of this contract attached, notice of waiver to be given in writing to the office of the Mt. Forest Fur Farm at Detroit, Michigan, 30 days in advance."

On January 14, 1927, Mr. Morlock, in response to a letter from the Fur Farm requesting information as to the disposition of his increase, replied thereto:

"In response to the recent request as to disposition of increase of muskrats—I wish mine left in your care and allowed to pyramid according to the terms in my contract."

The fur farm, in an answer thereto bearing the same date, signed by its president and general manager, M. S. Bangs, said:

"Replying to your kind favor of the 14th instant, beg to inform you that we will pyramid your rats as you request."

Claiming default in performance on the part of the Mt. Forest Fur Farm of its obligations under these instruments, the plaintiff brought this action in assumpsit to recover the damages sustained by him thereby. In his declaration he alleged that the Mt. Forest Fur Farm had assigned and transferred all of its assets to the Mt. Forest Fur. Farms of America, Incorporated, a foreign corporation, in consideration of the assumption of its debts, obligations and liabilities. An appearance was entered by the foreign corporation and a plea of the general issue filed on its behalf. Before the hearing, a petition was filed by Harry J. Merritt, stating that he had been appointed receiver for the corporation and praying that he be substituted as defendant, and an order in compliance therewith was duly entered. Discontinuance was had as to the Michigan corporation. An assignment, signed by Irene L. Morlock, of any interest she then had in the contracts to H. P. Morlock was also filed.

On trial before the court without a jury, the plaintiff had judgment for $4,093.20 and interest, amounting in all to $4,943.68, from which the defendants have appealed.

Error is assigned upon the finding of the trial court—

"That the Mount Forest Fur Farm agreed to pyramid the rats of plaintiff for the three-years' period, as per his instructions, and are holding for whatever amount said rats and their increase would be worth on a pyramiding basis on said contract for the three-years' period."

Under the terms of the contract and special agreement attached thereto, the Michigan corporation, in consideration of plaintiff's purchase of two pairs of rats and the payment therefor, guaranteed that each of said pairs of rats would "drop at least 30 embryos every 12 months for at least three years, providing they are ranched on farms controlled or owned by the Mt. Forest Fur Farm," and agreed that plaintiff should have one-half thereof and that the fur farm should purchase plaintiff's share and pay him therefor within 14 months thereafter at a price stated therein. Before the first year had elapsed, in response to an inquiry of the fur farm, the plaintiff waived his right to delivery and stated in writing that he wanted the increase to which he was entitled to be left with the fur farm and allowed to pyramid, according to the terms of the contract. To the desire thus expressed, the fur farm, by its general manager, replied that it would "pyramid your rats as you request."

The only fair construction which can be placed upon these letters, when read in the light of the written instruments, is that, in consideration of the plaintiff's leaving the rats to which he was entitled at the end of the year with the fur farm, it would guarantee their increase as provided for in the contract. Otherwise, if plaintiff's rats were left on the ranch of the fur farm and mingled with other rats, as it seems clear the intention was to do, and as was

done, how could the increase therefrom be determined?

Illustrative of the understanding of Mr. Bangs as to the pyramiding provision, it appears that in February, 1928, he authorized Mr. Langworthy to prepare and publish in a newspaper a circular headed "Holders of the First Contracts," which contained the following:

"As next year will see the end of the first three-year contracts we take this time to inform all holders of these contracts that their increase will be pyramided this year for you as the majority expected or requested last year.

"Your year of increase has been about as last year and we have decided to pyramid them this year on the same basis, that is, your share is one-half of the increase, figuring 32 young per pair, or 16 rats from each pair for each party."

To what damages was plaintiff then entitled? Mr. Langworthy, who entered into the contract and special agreement with the plaintiff, and who was in the employ of the Michigan corporation in 1926, 1927 and 1928 as advisory biologist and salesman, was called as a witness by the plaintiff. He testified:

"I had a conversation with Mr. Morlock regarding the pyramiding of the increase. By pyramiding, is meant that we were instructed by the head man of the company to add one-half of the increase to what we already had in here through the period of three years. * * *

"There was a table later issued by the company for making such computation, and I made a computation of increase from two pair of rats from the computation I had, by pyramiding.

"I have made a computation, as to the rats referred to in Exhibit 1, the specific contract in this case, from 1926 through three years following, showing a total increase of 4,548 counting the breeders

and young combined; that is his share of the increase. That is one-half the total. The total increase would be twice that or about 8,000 and something.''

On cross-examination he was asked:

''From your own knowledge as a biologist as to the habits of rats, etc., you cannot tell me how many rats should be there at the end of the three-year period?''

And answered, ''Nobody can. Nobody can estimate the rats on a marsh, only by counting the houses.''

He was asked by the court, ''Have you ever figured out the death rate on rats?'' and answered:

''No I never have. They never have. They said there wasn't many diseases of rats there. That is the only thing they went on. They have found out a lot of things lately. There is a man in Jonesville making a very successful thing of what Bangs started. John Smith of Jonesville. His pens are all full. He stated the case of the conservation department charging him so much for each pelt. He found certain diseases especially of rats that will increase the death rate. He has been investigating and found out a lot of new things. Another man in Illinois has done a lot of experimenting and has done a lot of fine things. Mr. Bangs I do not think did any experimenting. He would not let me experiment. I don't know why.''

The computation made by him is not questioned, and, under the construction we have given to the written instruments and correspondence, the court was justified in fixing the amount to which plaintiff was entitled as the value of 4,548 rats. The lowest estimate of value was 90 cents per pelt, making the sum of $4,093.20, for which, with interest added, the plaintiff had judgment.

Counsel for the defendants, while questioning the amount of the judgment, fails to point out the damages to which plaintiff is entitled under the terms of the contract. He does say:

"We contend the plaintiff could recover at most the amount of his investment with interest thereon, which would be less than $100."

In *Ferguson* v. *Perry Coal Co.,* 213 Mich. 197, it was said (199):

"There may be contracts so inequitable and unconscionable that courts will not enforce them. But, as was said by Lord Hardwicke in *Earl of Chesterfield* v. *Janssen,* 2 Ves. Sen. 125, 155 (28 Eng. Rep. 82, 100), quoted in *Hume* v. *United States,* 132 U. S. 406, 411 (10 Sup. Ct. 134), these contracts must be such 'as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.'"

Surely, Mr. Bangs would not want to have this contract so construed.

Error is also assigned upon the finding of the trial court that the defendant, by taking over the assets of the Michigan corporation and assuming its liabilities, thereby became liable to the plaintiff for the damages here sought to be recovered.

The sale of the property of the Michigan corporation to the defendant was effected by action of the board of directors of the latter on March 30, 1928, in which an issue of its stock in payment thereof to the former was authorized. The minutes contain the following:

"All contracts and liabilities of Mt. Forest Fur Farm, a Michigan corporation, with relation to the property transferred are to be assumed by the Mt. Forest Fur Farms of America, Incorporated."

A balance sheet, showing the then assets and liabilities of the Michigan corporation, also appears in the record. The assets total $853,000.04. They include, however, land in Louisiana, valued at $567,156, and the Michigan ranch, valued at $6,500. Among the liabilities was an item of $46,457.01, for "purchase money obligation and accrued interest," and another of $45,675, for "purchase money obligations." The value of the assets over and above the liabilities was stated to be $731,209.53, for which 70,000 shares of class "B" stock and 100,000 shares of class "C" stock were authorized to be issued to it.

The defendants contend that, "assuming the assumption of liability was made," it was not "liable thereon in an action at law." The extract from the minutes and the list of the assets appearing on the balance sheet, above referred to, clearly indicate that the Michigan corporation transferred all of its property to the defendant. Among the assets was "cash on hand and in banks, $82,051.34."

In *Chase* v. *Michigan Telephone Co.*, 121 Mich 631, 634, the court said:

"The law is well settled in regard to liability of the * * * purchasing corporation for the debts and liabilities of the * * * selling corporation. Such obligations are assumed * * * when by agreement, express or implied, a purchasing corporation promises to pay the debts of the selling corporation."

"A corporation cannot sell all of its property, and take in payment stock in a new corporation, under an arrangement that has the effect of distributing the assets of the vendor among its stockholders, to the exclusion and prejudice of its creditors." *Grenell* v. *Detroit Gas Co.*, 112 Mich. 70, 72.

See, also, *Shadford* v. *Railway*, 130 Mich. 300; *Howell* v. *Lansing & Suburban Traction Co.*, 146 Mich. 450.

"Where a corporation purchased the assets of another and expressly agreed to pay its debts, the creditors of the latter may sue such purchasing corporation on the contract as a contract made for their benefit." 8 Thompson on Corporations (3d Ed.), p. 157, § 6074.

See, also, *Luedecke* v. *Des Moines Cabinet Co.,* 140 Iowa, 223 (118 N. W. 456, 32 L. R. A. [N. S.] 616), and cases in footnote to the latter.

Counsel for the defendants relies on our holding in *Tapert* v. *Schultz,* 252 Mich. 39, the syllabus of which reads as follows:

"Vendors may not maintain action at law against vendee's assignee for payments due under land contract, although assignee agreed with vendee to perform contract; there being no privity of contract between assignee and vendors."

The distinction is apparent. The vendor in that case sold real estate under a land contract. His vendee assigned the contract, and the assignee agreed therein to assume the obligation of the vendee to make payment to the vendor. In this case the defendant took over all of the assets of the Michigan corporation and, as a part of the consideration therefor, assumed its liabilities. The Michigan corporation was thereby left without assets on which the plaintiff might realize to collect its indebtedness, and the defendant, by its undertaking to pay, became the debtor of the plaintiff.

While the amount of plaintiff's judgment is out of all proportion to his investment, courts cannot make contracts for parties engaged in business affairs. They can but construe them as made, and under the facts here presented the judgment must be affirmed.

POTTER, NORTH, FEAD, WIEST, BUTZEL, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred.