122 F.2d 232 (1941)
In re MT. FOREST FUR FARMS OF AMERICA, Inc.
GULF REFINING CO. OF LOUISIANA et al.
v.
FITZGERALD.
COCKRELL et al.
v.
FITZGERALD (two cases).
Nos. 8802-8808, 8614, 8894.
Circuit Court of Appeals, Sixth Circuit.
August 16, 1941.
*233 *234 Butzel, Eaman, Long, Gust & Bills, of Detroit, Mich. (Frank D. Eaman and Victor W. Klein, both of Detroit, Mich., J. S. Atkinson, of Shreveport, La., Tinsley Gilmer, of Lake Charles, La., and George C. Schoenberger, Jr., of Houston, Tex., of counsel), for Gulf Refining Co. of Louisiana and others.
Monroe & Lemann, of New Orleans, La., Butzel, Levin & Winston, of Detroit, Mich., and Battle, Levy, Fowler & Neaman, of New York City (Monte M. Lemann, of New Orleans, La., A. J. Levin, of Detroit, Mich., George Gordon Battle, of New York City, J. Blanc Monroe, of New Orleans, La., Henry H. Sills, of Detroit, Mich., Walter J. Suthon, Jr., of New Orleans, La., and Pearson E. Neaman, of New York City, of counsel), for Freeport Sulphur Co.
Oxtoby, Robison & Hull, of Detroit, Mich., and Herold, Cousin & Herold, of Shreveport, La. (Oscar C. Hull and Leo I. Franklin, both of Detroit, Mich., and Samuel L. Herold, Jr., and Sidney L. Herold, both of Shreveport, La., of counsel), for Ernest Cockrell.
Robert S. Marx, Carl Runge, Lawrence I. Levi, and Julian G. McIntosh, all of Detroit, Mich., Lazarus, Weil & Lazarus and Cobb & Saunders, all of New Orleans, La., Fraser, Effler, Shumaker & Winn, of Toledo, Ohio (Eldon S. Lazarus and Eugene D. Saunders, both of New Orleans, La., Ross W. Shumaker and Robert C. Dunn, both of Toledo, Ohio, Charles S. Abbott, of Ann Arbor, Mich., and Nichols, Wood, Marx & Ginter, of Cincinnati, Ohio, of counsel), for trustee, Frank Fitzgerald.
Before HICKS, HAMILTON, and MARTIN, Circuit Judges.
MARTIN, Circuit Judge.
This complicated litigation, involving millions of dollars, has been heard on the consolidated argument of nine cases and reaches us on appeal, in summary proceedings in a corporate reorganization in bankruptcy, in causes 8802-8808 from a judgment of the District Court for the Eastern District of Michigan against six appellants, Gulf Refining Company of Louisiana, Gulf Refining Company, Humble Oil and Refining Company, Shell Oil Company, Inc., Freeport Sulphur Company, all corporations, and Ernest Cockrell; on appeal from an interlocutory injunction in 8614, restraining appellants Ernest Cockrell, his curator ad hoc, and their attorneys, from further proceedings in a suit pending in the 25th Judicial District Court for the Parish of Plaquemines, State of Louisiana; and on appeal from an interlocutory injunction in 8894, restraining appellants Ernest Cockrell and two Louisiana law firms, Herold, Cousin & Herold, and Plauche & Plauche, and also the Moran Corporation of the South and Isaac E. Heller, who are not appellants, from taking any further steps in another suit pending in the same Louisiana Judicial District Court.
The appellee, Frank Fitzgerald, trustee for Mt. Forest Fur Farms of America, Inc., the corporate debtor, appealed in the *235 main case (8802-8808 consolidated) from that portion of the judgment which denied the full relief sought; but, for brevity and clarity, will be designated only as appellee.
On July 16, 1926, a corporation, Mt. Forest Fur Farm, was created under the laws of Michigan for the purpose of owning and operating fur and game farms in Michigan and elsewhere in the United States and in Canada and of manufacturing and dealing in furs and fur garments, including the right to deal in real estate in furtherance of its charter purposes. On March 29, 1928, this Michigan corporation sold its properties and assets to the debtor, Mt. Forest Fur Farms of America, Inc., incorporated under the laws of Delaware with like charter powers. The consideration received for this conveyance was stock of the new corporation and the assumption by it of all contracts and liabilities of the vendor. See Morlock v. Mount Forest Fur Farms of America, Inc., 269 Mich. 549, 257 N.W. 880. On September 28, 1928, Mt. Forest Fur Farm executed a deed to Mt. Forest Fur Farms of America, Inc., conveying the Louisiana land which is the subject matter of the present controversy.
Before the debtor corporation was created, Mt. Forest Fur Farm, after considerable negotiation, entered into a written agreement with appellant Ernest Cockrell, an oil operator, to purchase, for a consideration of two dollars per acre, approximately 53,000 acres of land situated on the west side of the Mississippi River in Plaquemines Parish, Louisiana. This contract of sale contained a perpetual reservation in Cockrell of "one-eighth of all minerals, including oil, gas and sulphur, which may be found in, under and upon said land."
Earnest money was paid and, after much wrangling between the parties, during which Cockrell threatened to call the deal off unless a required first payment of purchase money was made by a specified date, a deed to 127/150ths' interest in the land, described by townships and sections in Plaquemines Parish, Louisiana, as containing 52,500 acres, more or less, was executed by Cockrell to Mt. Forest Fur Farm on April 11, 1927, and recorded the following day. This deed contained an ambiguous mineral reservation. The consideration, paid partly in cash and partly by the delivery of one promissory note and the assumption of another, totaled $88,900 for Cockrell's 127/150ths' undivided interest in the land.
The other 23/150ths' undivided interest, owned by the Moran Corporation of the South, was acquired by Mt. Forest Fur Farm on June 30, 1928, by a deed of conveyance unquestionably reserving in the vendor all mineral rights.
Obvious ambiguity in the mineral reservation clause of the deed from appellant Cockrell to Mt. Forest Fur Farm is the fundamental casus belli in the instant case.
We quote the much-mooted language: "This Vendor is vested with and specially retains for himself, his heirs and assigns, and reserves from this sale, a perpetual royalty equal to one-eighth of all minerals, including oil, gas and sulphur, which may be found in, under, upon or beneath the lands herein above described, together with perpetual and exclusive rights to make and execute mineral leases on all or any portion of said lands for the exploration, development, production and marketing of any and all of said minerals, and also including perpetual rights of ingress and egress solely for said purpose of exploration, development, production and marketing of said minerals, at all times, and likewise the use of so much of the surface of said premises as may be found necessary and convenient for the exploration, development, production and marketing of said minerals which may be found and produced from said premises."
This reservation has been construed by the Supreme Court of Louisiana, which, adversely to the contention made by Mt. Forest Fur Farms, Inc., plaintiff in a suit brought in Louisiana to recover bonus money amounting to $50,000 which Cockrell received from the Gulf Refining Company for granting and extending a mineral lease, held that by virtue of the above quoted clause in his deed to Mount Forest Fur Farm, Cockrell had retained the perpetual and exclusive right to make and execute mineral leases on all or any portion of the land; that he had retained not merely the right to select the lessee and to fix the terms of the lease, and to lease as agent, but also the right to lease for his own benefit and that of his heirs and assigns "save as otherwise expressed" in the reservation; and that he was entitled to "all that the lease might bring, save as therein specified." Accordingly, denying the claim of Mt. Forest Fur Farms, the court affirmed a judgment awarding Cockrell the *236 bonus money. But the court announced that it was not concerned with the right to the royalties from the lease. Mt. Forest Fur Farms of America, Inc. v. Cockrell, 179 La. 795, 155 So. 228, 229.
If we have jurisdiction, this undecided issue, inter alia, must be decided here; if we have not, a court of competent jurisdiction should be the forum.
The lease from Cockrell of all mineral rights in the land to Gulf Refining Company of Louisiana was dated March 15, 1928; and, subsequently, on May 7, 1928, Roxana Petroleum Corporation (now appellant Shell Oil Company, Inc.) acquired from the Moran Corporation of the South a mineral lease on the remaining 23/150ths' interest in the 52,500 approximate acreage. On July 18, 1928, Roxana Petroleum Corporation and appellant Humble Oil and Refining Company obtained from the State of Louisiana, through its Governor, Huey P. Long, a lease of the mineral rights on the bed of Lake Grand Ecaille. By contract of October 8, 1929, appellants Humble Oil and Refining Company, Gulf Refining Company of Louisiana and Shell Oil Company, Inc. (which had succeeded Roxana), agreed to develop and operate jointly all mineral leases owned by them or subsequently acquired in an area which embraced the 52,500 acre tract. On February 10, 1932, appellant Freeport Sulphur Company subleased from the three oil companies all their rights and privileges under their respective leases to explore for, mine, produce and market sulphur.
After the discovery of oil on the property, the Board of Commissioners for Buras Levee District filed suit claiming title to 1,136 acres of the land. Mt. Forest Fur Farms of America, Inc., the Moran Corporation of the South, the three oil companies, and Ernest Cockrell were named as defendants; and, after a vigorous defense, succeeded in winning a four to three decision in the Supreme Court of Louisiana, rejecting the claims of the Levee Board. Board of Commissioners for Buras Levee District v. Mt. Forest Fur Farms of America, Inc., 178 La. 696, 152 So. 497.
But the Levee Board persisted in making claim to other portions of the realty. Cockrell countered by filing a declaratory judgment suit in the Federal Court which resulted in a decision that the judgment of the Louisiana Supreme Court in the Buras Levee Board suit was res adjudicata only as to the 1,136 acres there in controversy and that the title-claim of the Buras Board to the remaining portion of the land had not been adjudicated. Board of Com'rs for Buras Levee Dist. v. Cockrell, 5 Cir., 91 F.2d 412.
In consequence of this decision, the oil companies, the sulphur company and Cockrell, under advice of counsel, compromised the adverse claims of the Levee Board and other intertwined claimants. More than $475,000 has been paid to the Levee Board, its assignees, and the holders of over-riding royalty agreements under these compromise settlements. Appellants are presently paying royalties on their consolidated leases from the Levee Board.
In the summer of 1929, the oil companies drilled for oil and produced it in paying quantities in June, 1931. Since then, their production of oil from the premises in controversy has been continuous. Likewise, the sulphur company has continuously produced sulphur since December, 1933. The operations of the mineral lessees will be detailed later in this opinion.
At no time has either the debtor corporation or its predecessor, Mt. Forest Fur Farm, ever attempted to prospect the land, or produce oil, sulphur, or minerals therefrom. The use and occupancy of the property by these successive owners has been limited exclusively to fur gathering purposes.
Due to its default on contracts with many persons for the breeding of muskrats, Mt. Forest Fur Farms of America, Inc., on August 21, 1931, consented to receivership in a stockholders' suit in chancery in the Circuit Court for Wayne County, Michigan. The receiver took charge and carried on the business of trapping on the company's Louisiana property until abandonment of this enterprise in the early part of 1932.
An involuntary creditors' petition for reorganization of the debtor under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, was filed and allowed in the United States District Court. On appeal, the district court order approving the petition for reorganization was reversed and the cause remanded. Mount Forest Fur Farms of America, Inc. v. Farnsworth, 6 Cir., 92 F.2d 342.
A voluntary petition of the debtor for reorganization under Section 77B ensued and was approved by the district court, whose orders approving the petition, overruling creditors' motion to dismiss, and *237 appointing Frank Fitzgerald, trustee, were affirmed on appeal. In re Mt. Forest Fur Farms of America, Inc., 6 Cir., April 5, 1939, 103 F.2d 69.
Shortly after his appointment as temporary trustee, appellee obtained a show-cause order against which appellants filed motions to quash on jurisdictional grounds. No ruling was made upon the motions. On January 4, 1940, appellee Fitzgerald, then and now permanent trustee, filed an amended petition upon which he obtained an order to show cause why appellants should not be enjoined from exploring, drilling, mining, selling, moving, or otherwise appropriating oil, gas, sulphur and other minerals from the debtor's property in Louisiana; or, in the alternative, why appellants should not be directed to pay unto the petitioning debtor the royalties theretofore accrued or thereafter accruing for oil, gas, sulphur and other minerals already removed, or which might thereafter be removed, if it should be made to appear that appellants have the right to extract the minerals but have failed in the discharge of their legal obligation to pay the royalties due thereon.
Seasonably to the return day of the show-cause order, appellants, entering only special appearances, filed motions to quash and to dismiss the summary proceedings against them, averring that the court had no jurisdiction to enter the show-cause order of January 4, 1940.
These motions to quash and to dismiss presented elaborately the basis of objection of appellants to the jurisdiction. However, after hearing a two days' argument, the district court entered an order postponing disposition of the motions until the trial on the merits. Finally, after hearing all the evidence in the case, the motions to quash and to dismiss the summary proceedings were denied. The alternative motions of appellants for a stay of the proceedings and for a reference of the issues to the Louisiana State Courts for determination were likewise denied.
The trustee for the debtor corporation, moreover, prevailed upon the merits. The determinative adjudications of the district court were, as follows:
(1) The interests of appellants under the lease from Cockrell to the Gulf Refining Company of Louisiana were limited to one-eighth of 127/150ths of the minerals in controversy, and the debtor was vested with the other seven-eighths therein.
(2)Appellant, Freeport Sulphur Company, must account to the trustee for the debtor, on the basis of the proceeds from seven-eighths of 127/150ths of the sulphur produced (less the cost of production and a reasonable profit), for the minerals removed from August 23, 1938 (the date of the original petition and show-cause order), to date.
(3) Likewise, appellant, Humble Oil and Refining Company (the operating company under the agreement among the appellant oil companies), must account to the trustee for the proceeds of seven-eighths of 127/150ths of the oil produced, less the cost of production and a reasonable profit.
(4) Should appellant, Freeport Sulphur Company, whose operations were expressly conditioned in the decree, continue to produce sulphur from the land and should appellant, Humble Oil and Refining Company, continue to produce oil, each shall respectively account to the trustee for seven-eighths of 127/150ths of the sulphur and oil produced, less the cost of production and a reasonable profit to be subsequently determined.
(5) A hearing was ordered to be held to ascertain such cost of production and reasonable profits and the amounts now due or hereafter to become due from the production of oil and sulphur, pending which hearing the above-named appellants shall pay into the registry of the court, for future disposition by court order, four dollars a ton on all sulphur and ten cents a barrel on all oil thereafter produced from the entire mineral interest in all the property.
(6) Upon failure of the two above-named appellants to pay the amounts specified in the preceding paragraph, each shall be restrained and enjoined from further production of sulphur and oil on the property.
Cases 8802-8808 are here on appeal from the judgment and decree of the district court, both upon the merits and upon the jurisdictional motions and the motions to stay and to refer the issues to the courts of Louisiana.
Case 8614 is before us on appeal from the interlocutory injunction, restraining further steps or proceedings by appellants in suit entitled Mt. Forest Fur Farms of America, Inc., v. Ernest Cockrell, et al. [No. 1190], instituted March 30, 1936, by the debtor corporation concerning similar subject matter to that embraced in cases *238 8802-8808 and now pending in the 25th Judicial District Court for the Parish of Plaquemines, Louisiana. Appellants challenged the jurisdiction of the United States District Court to issue the injunction.
Likewise, consideration of case 8894 presents in the first instance the question of jurisdiction involved in cases 8802-8808. The appeal is from an interlocutory injunction, restraining further steps by appellant Cockrell and the law firms of Herold, Cousin & Herold, and Plauche & Plauche, all appellants, and the Moran Corporation of the South and Isaac E. Heller, in a pending suit entitled Ernest Cockrell, et al. v. Moran Corporation of the South, et al. [No. 1603], filed October 14, 1940, in the 25th Judicial District Court for Plaquemines Parish, Louisiana. In its decree, the court below recited that the subject matter in the pending Louisiana case [No. 1603] is substantially identical with the issues adjudged in cases 8802-8808.
Manifestly, if the district court lacked jurisdiction in cases 8802-8808, the interlocutory injunctions in cases 8614 and 8894 were improvidently granted.
In all these appealed cases, we confront at the threshold the question whether the district court had jurisdiction to enter the show-cause orders. If a negative answer is impelled by applicable law, there should be no further adjudication here.
(1) The challenged jurisdiction must be resolved, not by a test of title, but by determination of the issues of possession of the res in controversy as of the time reorganization proceedings were instituted by the debtor corporation.
No jurisdiction vests in a court of bankruptcy to adjudicate, in a summary proceeding, a controversy over property held adversely to the bankrupt estate, except by consent of the adverse claimant, or where the adverse claim is merely colorable. Unless summary jurisdiction exists, the trustee in bankruptcy must resort to plenary suit. Harrison v. Chamberlin, 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897; In re Cadillac Brewing Co., 6 Cir., 102 F.2d 369. Compare First National Bank v. Chicago Title & Trust Co., 198 U.S. 280, 25 S.Ct. 693, 49 L.Ed. 1051.
The Supreme Court, while recognizing in Taubel, etc., Co., v. Fox, 264 U.S. 426, 44 S.Ct. 396, 68 L.Ed. 770, the power of Congress to determine the extent of the exercise of bankruptcy jurisdiction by summary proceeding in Federal Courts through possession of the res or otherwise, held that no summary jurisdiction to adjudicate the validity of a substantial adverse claim to property not in possession of the Federal Court, except by consent of the adverse claimant, had been conferred by the Bankruptcy Act of 1898, 11 U.S.C.A. § 1 et seq. Mr. Justice Brandeis stated (264 U.S. at page 433, 434, 44 S.Ct. at page 399): "As every court must have power to determine, in the first instance, whether it has jurisdiction to proceed, the bankruptcy court has, in every case, jurisdiction to determine whether it has possession actual or constructive. It may conclude, where it lacks actual possession, that the physical possession held by some other persons is of such a nature that the property is constructively within the possession of the court. * * * But in no case where it lacked possession, could the bankruptcy court, under the law as originally enacted, nor can it now (without consent) adjudicate in a summary proceeding the validity of a substantial adverse claim." Cf. First National Bank of Negaunee v. Fox, 6 Cir., 111 F.2d 810.
It was reasserted in Harris v. Brundage Co., 305 U.S. 160, 59 S.Ct. 131, 83 L.Ed. 100, that in every case the bankruptcy court has power, in the first instance, to determine whether it has such actual or constructive possession as is essential to procedural jurisdiction, and to determine controversies relating to property in possession of agents of the debtor at the time of the filing of the petition in bankruptcy.
In a recent case, Thompson v. Magnolia Petroleum Company, 309 U.S. 478, 481, 60 S.Ct. 628, 630, 84 L.Ed. 876, the Supreme Court said: "Bankruptcy courts have summary jurisdiction to adjudicate controversies relating to property over which they have actual or constructive possession. And the test of this jurisdiction is not title in but possession by the bankrupt at the time of the filing of the petition in bankruptcy."[1]
*239 The rule, that if ownership is claimed by the bankrupt all property in his possession at the time of the filing of the petition in bankruptcy passes into the custody of the bankruptcy court, has been applied to a railroad reorganization under Section 77 of the Bankruptcy Act, as amended March 3, 1933, c. 204, Sec. 1, 47 Stat. 1474, 11 U.S.C.A. § 203 note. But the right of the court to issue injunctions and all writs necessary to protect its physical possession from interference was predicated upon possession of the res. Ex parte Baldwin, 291 U.S. 610, 615, 54 S.Ct. 551, 78 L.Ed. 1020.
Appellee has made the point that in Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island Ry., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110, which sustained the constitutionality of Section 77 of the Bankruptcy Act, the highest court maintained the power of a bankruptcy court to issue, in a summary proceeding, injunctive process to prevent interference with a plan of railroad reorganization. The opinion, however, does not gainsay the principle that jurisdiction in a summary proceeding rests upon actual or constructive possession of the res. No adverse claim by one in possession was involved and the asserted liens were not disputed. The power of a district court to issue process for service outside the district, pursuant to Section 77(a), was upheld.
A provision similar to that contained in Section 77(a) will be found in Chapter X, § 111, of the Chandler Act, 11 U.S.C.A., § 511: "Where not inconsistent with the provisions of this chapter, the court in which a petition is filed shall, for the purposes of this chapter, have exclusive jurisdiction of the debtor and its property, wherever located."
Neither exclusive jurisdiction of the debtor nor power to issue process outside the district confers upon the bankruptcy court the power, in a summary proceeding, to decide, without the consent of an adverse claimant, a controversy concerning property in his possession, unless his claim be merely colorable. Were it otherwise, every bona fide possessor of property held adversely to a bankrupt could be haled into a distant Federal Court to defend his right to the property whenever the trustee in a reorganization proceeding should choose to corral him summarily.
No such unreasonable election may be deduced from the language of the statute, or from the authorities which have been considered.
(2) Does the res in controversy here consist of mineral rights or servitudes susceptible of separate ownership and possession apart from the ownership and possession of the surface of land?
Does the exercise of a mineral right or servitude by extracting and actually possessing the minerals from land constitute possession of the right or servitude?
To determine the issue of jurisdiction, these questions must be answered in accordance with Louisiana law. Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. The highest state court is the final authority on state law. Fidelity Trust Co. v. Field, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109. We must, therefore, carefully study the opinions of the Supreme Court of Louisiana.
It has long been settled law in Louisiana that oil and gas in place are not subject to absolute ownership as specific things apart from the soil of which they form part, and that a grant or reservation of such oil and gas carries only the right to extract such minerals from the soil. Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207, 242, citing eight earlier Louisiana decisions. The court said: "* * * No matter what the intention of the parties be, the owner of lands cannot convey or reserve the ownership of the oils, gases, and waters therein apart from the land in which they lie; and *240 we so hold, because the owner himself has no absolute property in such oils, gases, and waters, but only the right to draw them through the soil and thereby become the owner of them." 150 La. at page 863, 91 So. at page 245.
In Wemple v. Nabors Oil & Gas Co., 154 La. 483, 97 So. 666, the court declared that there are only two kinds of estates in land: (1) corporeal, termed ownership [Civil Code, Art. 505] and (2) incorporeal, termed servitude [Civil Code, Arts. 533, 646, 647]; and that mineral servitudes grant merely the right to extract and appropriate minerals. Decision of the case, which was a civil action by a landowner for slander of title, was grounded, however, upon the failure of one who had acquired mineral rights from a prior owner to explore for minerals within the required ten years' prescription period. We find nowhere in the opinion an intimation that the right of a person entitled to a mineral servitude to possess the same through exercise should be denied.
Appellee places what seems to us insecure dependence upon Federal Land Bank of New Orleans v. Mulhern, 180 La. 627, 157 So. 370, 95 A.L.R. 948. The defendant had mortgaged real property to the plaintiff. Subsequently, he entered into a mineral lease with a third party, who drilled and brought in a gas well. A foreclosure suit, brought by the mortgagee, was sustained upon the ground that either partial or total exhaustion of the gas supply would impair "the real right to take gas from the land," and would necessarily depreciate the security of the mortgage. The emphatic fact was that the mortgage antedated the mineral lease. Appellee stresses the following language of the original opinion: "While the owner of land does not own the fugitive minerals, such as oil and gas, beneath its surface, but only the right to reduce them to possession and ownership, and while such minerals are not susceptible of ownership apart from the land [citing Frost-Johnson Lumber Co. v. Salling's Heirs, supra], yet those minerals, while in place in the ground beneath the surface, unsevered, are real estate, a part of the land itself, a part of the realty, as much so as timber, coal, iron, and salt." 180 La. at page 634, 157 So. at page 373.
But, on rehearing, the court explained: "What the court intended to state was, that the owner of real estate unquestionably has a right to go on his land and reduce to possession fugitive minerals, in order to gain complete ownership thereof. He can therefore contract away to another, in the form of a mineral or mining lease, this real right."
Appellee leans heavily upon a case decided fifteen years ago, Exchange National Bank of Shreveport v. Head, 155 La. 309, 99 So. 272, 274.
The facts were that a mortgage creditor began a foreclosure proceeding in the state court, pending which the mortgagor (Shields) was adjudged bankrupt. The mortgagee dismissed his state court action and proved his debt in bankruptcy. The property of the bankrupt was ordered sold, free of all liens and incumbrances; the mortgagee purchased the mortgaged land at the bankruptcy sale, and instituted suit in the state court against the mineral lessee (Head) for cancellation of the mineral lease from the public records.
The mortgagee (the Exchange National Bank) prevailed. It was held that, though the mineral lease had been executed before the mortgage, prior recordation of the mortgage entitled the trustee in bankruptcy, being vested with all rights of the mortgage creditor, to sell the land free of the rights of the mineral lessee (Head).
Certain dicta in the opinion of the Supreme Court of Louisiana is stressed by appellee: "* * * The only right which was conveyed by Shields to Head under the oil lease was a right of servitude (an incorporeal right), a real right on the land, a right to extract the oil and utilize the gas from the land, and when Shields surrendered the land in bankruptcy, this real right (this servitude) went with the land into the possession of the trustee in bankruptcy and likewise the possession of the land, for as we have already seen (Nabors Oil & Gas Co. v. Louisiana Oil & Refining Co., supra [151 La. 361, 91 So. 765]), the lessee under an oil and gas lease cannot deny or contest the right of possession of his lessor."
The opinion writer in the Head case, in citing Nabors Oil & Gas Co., supra, evidently did not recall that on rehearing of the Nabors case [151 La. 361, 91 So. 778], the court had said: "A majority of the members of this court did not concur in the expressions in the opinion originally handed down in this case. * * * the doctrine that an ordinary lessee, as of a house or farm, cannot dispute the title of his lessor *241 during the term of the lease, has no application to a contract by which a person acquires mineral rights, in the form or name of a contract of lease. Such a contract, in that respect, is more like a sale than an ordinary lease."
Nor can the obiter dicta in the Head case be reconciled with later decisions: Bodcaw Lumber Co. of Louisiana v. Cox, infra, and Connell v. Muslow Oil Co., infra.
It was held in Bodcaw Lumber Co. of Louisiana v. Cox, 159 La. 810, 106 So. 313, 314, that a sale of land for taxes does not divest the reservation of a prior mineral servitude. The court said that in all cases cited "in which it was held that oil and gas beneath the surface is not subject to ownership, as corporeal property, it was plainly and distinctly held that the grant or reservation of the oils and gases carried with it the right to extract such minerals from the soil; that such right was an incorporeal right  a real right or servitude." It was further declared that "when the plaintiff reserved the oil, gas, and minerals under the land sold, it reserved the right to mine for such minerals and to reduce them to possession, and, this being a real, incorporeal right, the plaintiff unquestionably has a standing in court to vindicate and protect such right * * *." In the Bodcaw case, in holding that plaintiff's ownership of the mineral servitude could not be disturbed by a tax sale, the court relied upon Shaw v. Watson, 151 La. 893, 92 So. 375, 378, where it had been denied that a transfer of mineral rights is nothing more than the imposition of an incumbrance, like a mortgage or an ordinary lease for occupancy or cultivation; but on the contrary had been announced that the sale of mineral rights, constituting a servitude upon the land, of the character of incorporeal real property, is an alienation of a part of the landowner's interest in land and is "a dismemberment of his ownership," being "more like a sale of an undivided interest in the land than like the imposing of a mortgage or an ordinary lease upon the land."
Adherence to the same concept was manifested in Wiley v. Davis, 164 La. 1090, 115 So. 280, and in Palmer Corporation of Louisiana v. Moore, 171 La. 774, 132 So. 229.
In the former case, it was said that "the granting of a mineral lease on property is the granting of a servitude thereon [citation] and hence constitutes a dismemberment of said property amounting to a partial alienation thereof." 115 So. 281.
In the latter case, the statement was made that "when a landowner sells only the mineral rights in his land, or sells the land and reserves the mineral rights, the transaction constitutes a dismemberment of the ownership, and is a sale or reservation, as the case may be, of one of the elements of ownership." 132 So. 232.
Further rationale to the same effect is found in the earlier case of Hanby v. Texas Co., 140 La. 189, 190, 194, 72 So. 933, 934, where it was observed that the right of an owner to use the surface of his land to reduce to possession underlying oil and gas may be so alienated by him as to "dismember the title," whereupon the resultant rights "retain the nature of the thing upon which they bear as though no dismemberment had occurred."
Connell v. Muslow Oil Co., 186 La. 491, 172 So. 763, 766, decided in 1937, is a strong bulwark for the position of appellants. The facts in that case were that the lessee of the mineral rights to 80 acres of land in Caddo Parish, Louisiana, produced oil on the south forty acres of the tract. Reserving all mineral rights, the landowner subsequently sold the land to another, who conveyed the north forty acres without reservation of the mineral rights. Traced from this vendee through two similar conveyances, in which the mineral rights were not reserved or mentioned, Connell acquired title to the north forty acres, took possession of the land which he had purchased, and cultivated a part of it. He held possession for the prescriptive period required to acquire title by adverse possession in Louisiana. No well having been drilled on the north forty acres, Connell sued the Muslow Oil Company, which had acquired the mineral rights to the entire eighty acres. He claimed that, by prescription of ten years, he owned the mineral rights to the north forty acres, upon which no well had ever been drilled. In opposition, the Muslow Oil Company claimed possession of the mineral rights, or servitude, upon the north forty acres by reason of the admitted fact that it had drilled a well on the south forty acres of the tract.
The contention of the Muslow Oil Company was sustained for the reason that "the exercise of the mineral rights, or servitude, on any part of one continuous tract of land upon which the servitude is *242 imposed is considered an exercise of the right on the whole tract." Quoting Article 3432 of the Louisiana Civil Code, the court said that "the possession of incorporeal rights, such as servitudes and other rights of that nature, is only a quasi possession, and is exercised by the species of possession of which these rights are susceptible." The court emphasized that the original mineral-rights lessee and its successors in title had "retained possession of the mineral rights, or servitude, on the whole 80 acres of land, in the only way that the law provides for the exercise of the right of possession of a servitude, or an incorporeal right."
The court said, further: "It is not disputed that the exercise of the servitude, by the operating of the oil well, was open and notorious, and apparent to every one in the neighborhood. There was the derrick, the pumping rig, oil tanks, and other apparatus, and trucks hauling materials to the well; all of which was obvious to every one in the vicinity, and the passersby. * * * The important fact is that the Natalie Oil Company [original lessee] and its successors in title, by exercising their mineral rights, or servitude, upon a part of the 80 acres of land, protected the servitude on the whole 80 acres against loss by prescription." 186 La. at pages 494-496, 172 So. at pages 764, 765.
Likewise, in a late case, Allison v. Maroun, 1939, 193 La. 286, 190 So. 408, 410, the ratiocination was repeated that "the kind or species of possession of which a mineral lease is susceptible, or the way in which the lessee may exercise his right of possession, is by drilling or exploring for the minerals, and taking possession of such as he may discover."
Although the mineral lessee's suit was dismissed because there was no proof that he had explored or drilled for minerals, it was said that "it may be assumed that a holder of a mineral lease may, under the provisions of Act No. 205 of 1938,[2] maintain an action for slander of his title, if he is actually exercising his right of possession of his `incorporeal immovable property.' * * *" 193 La. at page 293, 190 So. at page 410.
Asserting that "mineral servitudes are property rights, in fact, the most valuable property in the State," the Supreme Court of Louisiana recently held in Ohio Oil Co. v. Cox, 196 La. 193, 198 So. 902, 908, that the drilling of a "dry hole" by the assignee of a mineral-rights lessee interrupted the running of prescription then accruing against the claims of the mineral claimants.
From our foregoing review of the Louisiana authorities, we conclude that, under Louisiana law, a landowner may lease his own right to extract minerals from his land in such manner as to vest the mineral-rights lessee with the right to possess the mineral servitude by exercising it; and that such possession is adverse to any claimant, including the owner, who asserts an adverse claim to the mineral rights.
(3) The actual possession by appellants of their mineral servitudes by the active exercise thereof has been abundantly shown by evidence of record.
*243 After obtaining its sulphur rights by sublease on February 10, 1932, appellant, Freeport Sulphur Company, entered upon a survey, followed by the drilling of a prospect well around March 15, 1932. Continuous operations on the property have been conducted by the sulphur company since that date.
More than $6,000,000 has been expended in capital investment. A fully equipped sulphur producing plant has been installed, operated and maintained. Included in the structure and equipment are a boiler plant, a warehouse, dredging, loading and transportation equipment, drilling and sulphur-handling machinery, pipe lines, power lines and shops. Even a ten-mile canal for hauling men and materials has been provided. Sulphur has been produced from the land continuously since December, 1933, and 117 sulphur wells have been drilled. Up to January 1, 1940, 1,621,060 tons of sulphur, of the aggregate value of approximately $25,000,000 had been mined. At the time depositions were taken, 370 employees of the sulphur company were engaged in active production work and were, of course, upon the land.
In August, 1929, the oil companies began to exercise their mineral servitudes by drilling for oil. Since that date, their operations on the land have been continuous. Their first well was brought in during June, 1931, since which time they have drilled eleven producing wells and eleven dry holes, and have produced more than 2,700,000 barrels of oil from the sub-surface of the land. They have dredged canals, built thirteen storage tanks with an aggregate storage capacity of 10,500 barrels, and have erected on the land numerous buildings, including a combination office and mess hall, a warehouse, a boathouse, a bunk house, a guest house, and a recreation hall.
Surely these manifold occupancies and activities of the sulphur company and the oil companies constitute the only "kind or species of possession of which a mineral lease is susceptible," and the only way in which the [mineral] lessee may exercise his possession. See Allison v. Maroun, supra. Their exercise of these mineral servitudes was certainly "open and notorious, and apparent to every one in the neighborhood" and constituted the sole species of possession of which these rights are susceptible. See Connell v. Muslow Oil Co., supra.
The possession by appellants of their mineral servitudes has been openly adverse to the appellee landowner, now claimant in adverse interest, who has for many years acquiesced in such possession, has never attempted to extract oil, sulphur or other minerals, but has been content to confine its own activities to trapping for furs, which was the original purpose for which the land was bought.
(4) Appellee contends that any possession by appellants of the mineral servitude is precarious possession, subservient to the possession of the owner of the land. He quotes, inter alia, the Civil Code of Louisiana, Article 3556, paragraph 25: "That possession is called precarious, which one enjoys by the leave of another, and during his pleasure. The title which excludes the ownership, such as a lease, is also called precarious."
Appellee insists that, in Louisiana, a mineral servitude is in the nature of a limited usufruct. Sample v. Whitaker, 172 La. 722, 726, 135 So. 38, 39. Even should this be conceded, the Louisiana Civil Code, Article 556 provides that "the usufructuary can maintain all actions against the owner and third persons, which may be necessary to insure him the possession, enjoyment and preservation of his right."
Bell v. Saunders, 139 La. 1037, 72 So. 727, cited by the appellee, did not involve a controversy between a landowner and his usufructuary.
It is manifest from Connell v. Muslow, supra, that possession of a mineral servitude is independent of the possession of the surface by the owner of the land.
A mineral lessee may maintain his possession against his lessor as effectively as against any other person. State ex rel. Jennings-Heywood Oil Syndicate v. De-Baillon, 113 La. 572, 37 So. 481, 483. This Louisiana case was quoted and followed in Pan American Petroleum Co. v. United Lands Co., 5 Cir., 96 F.2d 26, 28. The Circuit Court of Appeals commented upon the effect of this Louisiana decision: "A lessee in possession thus may defend his possession against the world, including his lessor * * *."
On the proposition that in a controversy with his lessor, the possession of the lessee may be independent, compare Warren v. Palmer, 310 U.S. 132, 60 S.Ct. 865, 84 L.Ed. 1118.
In Carey v. Cagney, 109 La. 77, 82, 33 So. 89, 91, the court stated: "Constructive possession can in no case have the effect *244 of ousting actual possession held under an adverse title giving color of right. One is a fiction of the law; the other a tangible fact. The fiction is inoperative as against the fact; the unreal as against the real."
The contention must be rejected for the further reason that the appellant sulphur company and the appellant oil companies are in possession of their mineral servitude, not under leases from the debtor corporation or its predecessor, but under mineral lease titles originating directly from Cockrell, direct vendor of the vendee who sold the land to the debtor. The right of Cockrell to execute the mineral leases "in his own right, and not as agent for anyone" is res adjudicata. Mt. Forest Fur Farms of America v. Cockrell, 179 La. 795, 155 So. 228, 229, supra. His right to retain the bonus money received for executing the mineral leases is also res adjudicata. Idem.
(5) We are not impressed with appellee's argument that appellants submitted to the jurisdiction of the bankruptcy court and consented to these summary proceedings by their motions to stay.
It is true that, in a summary proceeding in bankruptcy, an adverse claimant in possession of the property in controversy may waive his privilege of plenary suit; but, not having his consent, the bankruptcy court may not proceed summarily. MacDonald v. Plymouth County Trust Co., 286 U.S. 263, 52 S.Ct. 505, 76 L.Ed. 1093; Harrison v. Chamberlin, supra. Cf. Beeler v. Schumacher, 6 Cir., 71 F.2d 831, affirmed, 293 U.S. 367, 55 S.Ct. 230, 79 L. Ed. 433.
On the record here, appellants not only did not consent to, but opposed vigorously the exercise of summary jurisdiction by the district court. Timely to the show-cause order, appellants, as their first defensive move, challenged jurisdiction by appropriate motions to quash and to dismiss on jurisdictional grounds. Two days of oral argument was heard, following which the district judge stated that he found no merit in the motions, but entered no orders on them. The motions were stigmatized as "an attempt to use the courts to delay and hinder people from enforcing their property rights"; but the court announced that, for purposes of expedition, the hearing of the motions would be continued until the hearing on the merits. Counsel for all appellants excepted to the comments of the court.
Appellant, sulphur company, and the appellant oil companies, on April 1, 1940, filed notice that when the cause should be called for trial on April 4, 1940, they would, with full reservations of their objections to the jurisdiction of the court and of their rights under their pending jurisdictional motions, move for the stay of all further proceedings against them until the final determination of a suit pending in Louisiana (Mt. Forest Fur Farms of America, Inc. v. Cockrell, hereinbefore mentioned), or of such appropriate action, suit or proceeding as might be brought by the trustee of the debtor against them in the state courts of Louisiana.
In pursuance of this notice, appellants, on the date specified therein, moved in open court for a stay of the proceedings and for a reference of the issues to the state courts of Louisiana, on the predicate of consonance with the course directed in Thompson v. Magnolia Petroleum Company, supra. Thirteen issues of Louisiana law were enumerated in their motion, including the question necessary to be answered to decide the point of summary jurisdiction, whether under Louisiana law the possession taken by appellants under their mineral lease from Cockrell constitutes such possession of the res in controversy as to defeat the jurisdiction of the bankruptcy court.
Following the presentation of the motion to stay, the announcement was made from the bench that, after further study of the briefs and authorities, the court had reached the conclusion that the case should proceed to proof before the question of jurisdiction should be decided. The court added: "Of course, the question of the jurisdiction is always present, and at any time that I determine that we have no jurisdiction, we will just stop."
Thus assured, counsel for appellants proceeded to try the case, but during the trial reiterated, several times, their reservation of their rights under the motions. For an instance, one counsel stated: "If your Honor please, in proceeding with evidence for the respondents in this cause, I do so under the distinct reservation of all rights under all jurisdictional objections heretofore made, and subject to those jurisdictional objections which go both to the jurisdiction of this court, and to the right of this Court to conduct these proceedings summarily. * * *"
The record has been searched in vain for any evidence of actual consent to or express *245 waiver of jurisdiction by any words or conduct of appellants, or their attorneys; on the contrary, the position that the district court possessed no jurisdiction over the subject matter was steadfastly maintained by the appellants.
Moreover, Rule 12(b) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, is pertinent. The rule provides: "No defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion."
By virtue of this rule, objection to the jurisdiction could have been properly joined with the motion to stay. The rule does not forbid the course pursued by the district court in considering the separate motions as joint defenses, though not filed simultaneously.
(6) In considering the question of jurisdiction, we have borne in mind that "due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined." Shamrock Oil & Gas Corporation v. Sheets, 61 S.Ct. 868, 872, 85 L.Ed. 1214, decided April 28, 1941. Healy v. Ratta, 292 U.S. 263, 54 S.Ct. 700, 78 L.Ed. 1248.
Let the judgment and decree of the district court in consolidated cases 8802-8807 be reversed and the motions of appellants to quash and to dismiss the summary proceedings be sustained. The cross-appeal of Frank Fitzgerald, Trustee for Mt. Forest Fur Farms of America, Inc., No. 8808 is dismissed.
In cases 8614 and 8894, let the decrees of the district court be reversed and the interlocutory injunctions dissolved.
NOTES
[1] It should be observed that, while in Thompson v. Magnolia Co., supra, it was stated that possession of lands under claim of fee simple ownership furnished adequate basis for summary jurisdiction where the right to the disputed oil necessarily hinged upon the question of fee simple ownership, the decision does not point the way to summary jurisdiction here, because the mineral rights involved in the instant controversy are not determinable by the fee simple title, but by interpretation of an oil, gas, sulphur and mineral reservation in a deed of conveyance to land.

Furthermore, in the Magnolia Petroleum Company case, "no one had, when the petition was filed, physical possession of the fugitive oil apart from the lands under which it lay," but numerous wells had been drilled in nearby proximity. In the case before us, the adverse claimants for many years have been producing and capturing oil and sulphur from underneath the surface of the land. Whether exercise of the mineral servitude in this manner constitutes such possession as will defeat summary jurisdiction, even though the owner of the land be in actual possession of the surface, must be decided by the appropriate application of Louisiana law, which will be hereinafter considered and discussed.
[2] Act No. 205 of 1938 provides: "That oil, gas and other mineral leases, and contracts applying to and affecting such leases or the right to reduce oil, gas or other minerals to possession, together with the rights, privileges and obligations resulting or flowing therefrom, are hereby defined and classified as real rights and incorporeal immovable property, and may be asserted, protected and defended in the same manner as may be the ownership or possession of other immovable property by the holder of such rights, without the concurrence, joinder or consent of the landowner, and without impairment of rights of warranty, in any action or by any procedure available to the owner of immovable property or land.

"Section 2. That this Act shall apply to all such transactions whether entered into prior to the passage of this Act or not."
In Allison v. Maroun, supra, it was said (190 So. at page 409): "It is a matter of general knowledge, and is conceded by all parties to this suit, that the cause which induced the Legislature to enact Act No. 205 of 1938 was the decision in Gulf Refining Co. v. Glassell, 186 La. 190, 171 So. 846, that the holder of a mineral lease had not a real right on the leased land and therefore could not institute successfully a petitory or possessory action. * * * But this cause which induced the Legislature to enact this law is not an indication that it was intended to confer upon the holder of a mineral lease a right of action for slander of his title to the lease, unless he is in possession or in the exercise of his right of possession of the leased premises."